**Affirm and Opinion Filed June 14, 2013**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-01582-CV**

## IN THE INTEREST OF K.A.F., D.A.F. AND A.L.F., CHILDREN

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 08-18472-Z**

## MEMORANDUM OPINION
Before Chief Justice Wright and Justices Lang-Miers and Lewis
Opinion by Chief Justice Wright

This is an appeal from the trial court's judgment terminating Mother's parental rights to her three daughters, K.A.F., D.A.F., and A.L.F.[1]  In six issues, Mother contends the evidence is legally and factually insufficient to support the termination, the Texas Department of Family and Protective Services (TDFPS) denied her fair treatment, and her trial counsel was ineffective. Finding no reversible error, we affirm.

## BACKGROUND

Mother and Father met in 1999 and were together until 2008.  They had their first child, K.A.F., in March 2001.  D.A.F. was born two years later in May 2003, and A.L.F. was born in February 2007.

---

[1] The trial court's judgment also terminates Father's parental rights to the children.  However, he does not appeal.

Between July 2002 and October 2011, TDFPS received eight referrals concerning the family. The referrals alleged family violence, negligent supervision and sexual abuse of the children, and drug use. Throughout this nine-year period, TDFPS offered or was ordered to provide various services to Mother and Father, including counseling, drug assessments, parenting classes, individual counseling, domestic violence counseling, and a batterer's intervention and prevention (BIP) program. Mother and Father sometimes completed services, and at other times, did not. In March 2012, after Mother and Father failed to complete court-ordered services in connection with the October 2011 referral, TDFPS decided to seek termination of Mother's and Father's parental rights. TDFPS alleged in its petition for termination that Mother engaged in eighteen of the twenty courses of conduct listed in the Texas Family Code as grounds for termination and that termination was in the children's best interest.[2] *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012).

The case was tried to the bench in October 2012. Over the two-day trial, the court heard testimony from fourteen witnesses, including Mother and Father.

TDFPS supervisor Tamara Hansen testified TDFPS received the first referral in July 2002, when K.A.F. was one year old. According to Hansen, the referral alleged negligent supervision of K.A.F. An investigation revealed Father sold drugs from the home, used cocaine, and had been violent towards Mother. K.A.F. was removed from the home, and Mother and Father were offered services with the goal of family reunification. During the next year, Mother and Father received individual counseling and completed parenting classes. Mother also

---

[2] The two statutory grounds TDFPS did not allege were section 161.001(1)(H) concerning abandonment of the Mother during pregnancy and section 161.001(1)(T) concerning a conviction for murdering the other parent of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(H),(T) (West Supp. 2012).

attended domestic violence counseling, and Father completed a BIP program and drug treatment. K.A.F. was returned home in July 2003, and the case was closed.

Hansen testified that TDFPS received a second referral in February 2008 alleging physical abuse of the three girls by Father and negligent supervision by both Father and Mother. At the time, K.A.F. was almost seven, D.A.F. was almost five, and A.L.F. was one. The referral followed Mother's hospitalization after she was assaulted by Father. The children were moved to the home of Mother's sister, and Father was charged with aggravated assault with a deadly weapon.[3] Hansen testified the children were sleeping at the time of the assault, but K.A.F. learned of the assault from her maternal grandmother and became fearful that Father would harm her. TDFPS found no evidence the children were being physically abused, but they were concerned about Father hurting Mother and the risk of harm to the children. According to Nicole Hawley, another TDFPS supervisor, Father claimed Mother was the aggressor, but there was no evidence supporting his allegation. Because the children were with their aunt, TDFPS did not seek an alternative placement for the children, but referred Mother and Father to its "Family Based Safety Services." Hansen and Hawley testified that, to help protect Mother and the children, they requested Mother receive both domestic violence and individual counseling and requested Father complete a BIP program and drug assessment, submit to random drug testing, and attend individual counseling. Both Mother and Father were also asked to complete parenting classes. Additionally, Mother agreed to a service plan that prohibited Father from living in the same home with the children and allowed him only telephone contact with them. Neither Mother nor Father completed any services, but they did separate. In February 2009, after determining the risk to the children had diminished because Father moved, TDFPS closed the case.

---

[3] The record reflects Father pleaded guilty and confessed to pushing Mother against the wall, biting her, pulling her hair, choking her, and using a firearm. In June 2009, he was placed on deferred adjudication community supervision for a period of five years and ordered to have no contact "in any form" with Mother.

In April 2009, two months later, TDFPS received a third referral. This referral alleged physical abuse, negligent supervision, and physical neglect of the children by Mother. Hansen testified an investigation revealed Mother had been using marijuana and was in another violent relationship. According to Hansen, the investigation also revealed "a lot of men [were] in and out of the home" and the home was unsanitary and unsafe for the children. The children were removed from the home, and Mother was asked to complete parenting classes and domestic violence counseling. Due to concerns that Mother was not properly supervising the children because of the marijuana use, TDFPS also asked Mother to complete a drug treatment program. Mother successfully completed all the services, the children were returned home, and the case was closed.

TDFPS received a fourth and fifth referral in 2010. In February 2010, there was an allegation of possible drug use in the home and negligent supervision by Mother as a result of the drug use. Hansen testified these allegations were ruled out after Mother tested negative for drugs on a random test. In December 2010, a fifth referral alleged physical abuse of the girls by Mother and led to disclosure by K.A.F. that she had been sexually abused by a male babysitter. Hansen testified that TDFPS was unable to determine the babysitter's identity; and because the babysitter did not live with Mother and the girls, the children were not removed and no services were offered.

The final three referrals were received between April and October 2011. The first of these referrals, in April 2011, alleged negligent supervision of the girls by Mother and sexual abuse of K.A.F. by the male babysitter. At the time the referral came in, however, the children were living with their maternal grandmother. According to TDFPS investigator Bree Kimball, Mother had been arrested in February 2011 for "[taking] a knife to [the] throat" of her boyfriend,

B.D., following an "altercation." Because the children were living with the maternal grandmother, TDFPS did not offer any services and closed the case.

The last two referrals, received in May and October 2011, alleged sexual abuse of D.A.F. by B.D. and sexual abuse of K.A.F. by Father, respectively. At the time of these referrals, the children were living in Fort Worth with Father and his wife as the maternal grandmother could no longer care for them because of health issues. TDFPS investigator Rebecca Williams testified that during the investigation of the May referral she learned from K.A.F., who was ten at the time, that the male babysitter had "fondl[ed] on her chest . . . got undressed and tried to scoot over her so his bottom brushed up against her." K.A.F. told Williams she had told this to Mother, but Mother "whipped" her and "never did anything." According to K.A.F., Mother "whipped" them often with a belt "for no reason" and left bruises and marks. K.A.F. told Williams Mother used and sold "crack and weed," and she had witnessed Mother "cut [B.D.'s] throat." She also witnessed B.D. hold a gun to Mother's head.

D.A.F., who was eight at the time, told Williams of "whippings" by Mother also and of fights between Mother and B.D that led to the police being called. She also told Williams that, when she was seven, B.D. touched her "private part" with his hand while he watched them at a hotel.

As part of her investigation, Williams also interviewed A.L.F. and Father. In response to Williams's question about the identity of A.L.F.'s mom, the four-year-old told Williams her name was A.F., and described her as Father's wife. A.L.F. said she felt safe at home with Father and with "granny and papa." Father stated he had not seen Mother in three years. He told Williams that when he and Mother were together, Mother "would always leave the children with him and take off for days at a time." Father admitted his relationship with Mother was unhealthy

–5–

and he had been charged twice for assaulting her. He blamed Mother for the violence, though, and stated he moved to Fort Worth to "get away from [Mother's] violence."

Williams testified she also met with Father's wife and their four-year-old and one-year old sons. She had no concerns with Father and his wife, and found their home clean, "adequate," and "free from safety and any health hazard[s.]" TDFPS left the children with Father and the case was closed.

The October referral was received after Mother tried to withdraw K.A.F. and D.A.F. from the school in which Father had enrolled them. Janet Prejean, K.A.F.'s fifth grade homeroom teacher during the 2011-2012 school year, testified Father told her at the beginning of the school year that Mother could have no contact with the children. While the school principal determined whether the children could be released to Mother, Prejean sat with K.A.F. and D.A.F. in the nurse's office talking. K.A.F. told Prejean that she was afraid to go with Mother because Mother "had just gotten out of jail . . . [for] cut[ting] her boyfriend [B.D.]. . . from this ear to that ear." K.A.F. told Prejean that Mother and B.D. "had very violent fights," that B.D. broke into their apartment "all the time," and that Mother "always let him come back." K.A.F. also told Prejean about the male babysitter. Prejean testified K.A.F. told her she did not feel any safer going home with Father because he had shown her a pornographic video and also had sexually assaulted her.

Kimball, who investigated this referral, testified an additional interview with K.A.F. confirmed Prejean's assertions. TDFPS removed the children from Father and placed them with P.K., Father's mother, while the allegations were investigated. During the investigation, Kimball interviewed Mother in the motel room where Mother was living. According to Kimball, the room smelled "overwhelming[ly]" of marijuana and Mother appeared to be under the influence of drugs. Mother told Kimball about her February 2011 arrest for stabbing B.D. and stated she

spent "a short amount of time" in jail before her parents bonded her out. The girls continued to live with her parents after she was released from jail, but she cared for them during the day until May 2011 when she was arrested for assaulting B.D. a second time. Mother told Kimball she was released from jail in June and found out the children had been taken to live with Father, but she did not know where Father lived. Kimball testified she did not believe Mother could provide for the girls at that time. Mother was collecting cans and redeeming them for money to pay for the motel room and admitted to using marijuana at least three times per week. Mother, however, was willing to get "help," specifically domestic violence counseling.

Kimball also met with P.K. about a week after the girls had been placed with her and learned that P.K. did not believe Father had assaulted K.A.F. as K.A.F. had reported. After this meeting, TDFPS sought court approval to place the children in foster care. Following a hearing, the children were placed in foster care and Mother and Father were ordered to complete services. Specifically, they were both ordered to complete a drug assessment, submit to random drug testing and a psychological evaluation, attend individual counseling, and follow through with any recommendations made by any of the service providers. Additionally, Mother was ordered to attend domestic violence counseling and complete parenting classes, and Father was ordered to complete a BIP program.

TDFPS's goal was initially reunification, and it provided Mother a service plan that would help her achieve that goal. In addition to completing the court-ordered services, the service plan required Mother to "stop participating in criminal acts and accept responsibility for prior criminal activities," to "demonstrate an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision for the children," and to "maintain a safe and appropriate home environment for her children." In the spring of 2012, when neither Mother nor Father had completed any services, Mother had failed to follow the service plan, and Father had

not had any contact with the girls since they were removed from his home, TDFPS decided to seek termination of Mother's and Father's parental rights. Hansen, the supervisor, explained termination would result in permanency and stability for the children. In her opinion, reunification of the girls with Mother was not possible because of her continued drug use, poor choices in relationships, and poor parenting skills. And, placement with other family members was not possible because there were no "fit" family members who could take them. She explained that Mother's sister, who had the girls temporarily while Mother was hospitalized and recovering from the 2008 assault by Father, had an extensive history with TDFPS herself. The maternal grandparents were unable to take the girls because of health issues and concerns over inappropriate statements the maternal grandmother made to the girls, and P.K., the paternal grandmother, was ruled out as an option because she did not believe that Father sexually abused K.A.F.

TDFPS caseworker Dorene Fox testified she began working with Mother in August 2012, a few months after the decision to seek termination was made and two months before trial.[4] At the time she began working with Mother, Mother had completed the psychological evaluation, but not completed the substance abuse assessment, parenting classes, or domestic violence counseling. Fox provided Mother the contact information for the domestic violence counseling and parenting classes' providers and set up the individual counseling and substance abuse assessment. Mother completed the substance abuse assessment, but did not participate in the other services. Fox expressed no personal opinion as to whether Mother's rights should be terminated, but testified that she believed the level of interest parents show in "getting their services . . . demonstrates their passion to be with their child." According to Fox, Mother visited

---

[4] Fox did not work with Father.

the children consistently "at times" and inconsistently "at other times." From November 2011 to the date of trial, Mother visited twenty-seven of forty-two scheduled times.

At the time of trial, K.A.F. was eleven, D.A.F. was nine, and A.L.F. was five. Fox and A.H., with whom the girls were placed in October 2011 after they were removed from the house of paternal grandmother P.K., testified D.A.F. and A.L.F. were "thriving" in foster care. D.A.F. came into foster care needing counseling for the abuse by B.D.; but, at the time of trial, she had recently completed counseling and was showing no signs of regression. She was described as "serious" and "reserved," but happy and a good student. A.L.F. was described as "happy-go-lucky" and a "silly" little girl who "loves to play and talk all the time." The girls expressed an interest in seeing Mother, but D.A.F. also expressed fear they would "get hit all the time" if they were returned home. TDFPS's plan for D.A.F. and A.L.F. was adoption, and two families had expressed an interest in adopting them.

A.H. testified K.A.F. initially did well in her home. K.A.F. talked with A.H. about the abuse by Father and the babysitter and expressed frustration because she felt no one believed her. About two weeks after being placed in A.H.'s home, K.A.F.'s behavior started changing. She became defiant, and encouraged her sisters to be defiant. She also became violent and started "talking about hurting herself." She was hospitalized for a couple of weeks in December 2011 after having to be restrained because she was "out of control." According to A.H., she was "throwing things against the wall," "talking about hurting herself," and asking others to "kill her."

After she was released from the hospital, K.A.F. went to a "specialized" placement center. She remained there for two months before being moved to an "intensive" placement center, where she was treated for major depressive disorder with recurring or severe psychotic features, post-traumatic stress disorder ("PTSD"), and oppositional defiant disorder. She

–9–

remained at this placement for about six months and was then moved to a psychiatric hospital in San Antonio. After spending two weeks at the hospital, she was placed at "Children's Hope," a residential facility where she remained at trial.

According to Fox, the caseworker, K.A.F.'s condition improved after being placed at Children's Hope. Her medications were reduced from six to three, her grades improved, she began "opening up" about the sexual abuse, and was working in counseling on "boundaries" and feelings of guilt. K.A.F. talked to Mother on the telephone while in San Antonio and also wrote to her, but at the time of trial, her therapist had recommended K.A.F. have no contact with Mother. K.A.F.'s prognosis was unknown and Hansen testified TDFPS's plan was to keep her at Children's Hope until she was discharged. Upon discharge, TDFPS planned to recruit an adoptive parent.

Mother testified she was thirty years old. She attended college, but dropped out after she met Father and became pregnant with K.A.F. Mother testified her relationship with Father was violent, and he was arrested for assaulting her not only in 2008, but also in 2005. According to Mother, Father punched her, pulled her hair, bit her finger, held a gun to her head, hit her with a cable, and hit her with a computer.

Mother testified her relationship with B.D. was violent also. Although she did not testify that B.D. was ever arrested for assaulting her, she admitted she was arrested twice for assaulting him. Both assaults occurred after he had been violent with her. Mother described the February 2011 assault where she cut his neck as self-defense, occurring while B.D. was "severely assault[ing]" her in the middle of the street. The second assault happened after he slapped her on the face. Mother testified that she reacted by throwing food at him, and he called the police. Mother testified she was charged with aggravated assault following the February incident. The charges, however, were subsequently reduced to misdemeanor assault, and she was placed on

deferred adjudication community supervision for one year. She was charged with misdemeanor assault for the second offense, but the case was subsequently dismissed. Mother testified her relationship with B.D. began in October 2010 and lasted less than a year.

Asked about her drug use, Mother testified that she began smoking marijuana when she was thirteen years old. She stopped smoking when she was eighteen, before K.A.F. was born, but started again, after she broke up with Father, and to alleviate symptoms of glaucoma. She testified she had been smoking consistently since 2010, continued to smoke despite being ordered not to smoke while on probation, and had last smoked three weeks before trial. She did not think her use of marijuana was "that serious," but was asking for help. She testified that she "mainly smoke[s] because of the situation [she is] going through" but believed that once her kids came home she would be "too busy" making up time to have a "need for that."

Asked about K.A.F.'s and D.A.F.'s allegations of sexual abuse, Mother testified she learned of the incidents from a TDFPS caseworker. She learned of the abuse by Father in October 2011 and of the abuse by the male babysitter in December 2010. Mother identified the babysitter as C.J. and stated that she left the girls on July 26, 2010 with C.J.'s wife, who ran a "babysitting business" in the apartment complex where they lived. At the time Mother dropped the girls off, C.J. was not there. Mother testified she spoke to K.A.F. after learning of the incident and believed it occurred, but she did not report the incident to the police because the caseworker said she would "take care of everything." Mother learned that B.D. had sexually abused D.A.F. when she got out of jail following the May 2011 assault on B.D. According to Mother, she stopped seeing B.D. as soon as she learned about the abuse.

Mother testified she loved the girls, missed them, and wanted them returned to her. She testified she "failed" the girls, but could now keep them safe and provide for them. She acknowledged that the abusive and violent relationships she had with Father and B.D. impacted

–11–

her children and it was not in their best interest to be exposed to violence. She also acknowledged that she had "whipped" the girls on occasions, leaving bruises, and had been unable to provide for them. She testified that she gave the girls to her mother in 2010 because she did not have a place to live and was working only part-time and had to collect cans to survive. She testified that if she could do things differently, she would have stayed in college and broken up with Father so that she would not have been around the initial violence.

Mother testified she had been "working on [her]self" for about two years and had her "act together" now. She was in counseling with her pastor at church, had maintained stable housing since November 2011, and had maintained stable employment since July 2012.[5] Mother recognized she needed to break the pattern of abuse. She testified she was in a BIP program as part of probation, learned she could not leave bruises when disciplining, and had not been in any relationship for over a year. She believed she would benefit from parenting classes and further counseling, but acknowledged she had not completed the parenting classes or counseling she was ordered to complete. Mother explained that she had problems with the caseworker setting up the counseling and appropriate parenting classes and would seek help on her own if necessary.

Mother testified she had a "wonderful" relationship with the children and had visited regularly with D.A.F. and A.L.F. over the past year. The visits she missed, as she explained, were a result of work or probation conflicts. Mother testified she had not visited K.A.F., but had received telephone calls and a letter from her.[6] She testified that if the girls were returned to her she would get a bigger apartment. When asked how she would handle K.A.F., she stated she

---

[5] Fox, Mother's last caseworker, disputed Mother's testimony regarding her employment. According to Fox, Mother had been fired from her job shortly before trial.

[6] The letter was mailed shortly after the children were placed in foster care. In the letter, K.A.F. states that it "sucks" to be her and it feels like Mother "let [them] go." She also tells Mother she loves her and that Mother should "let go" of B.D.

would "approach[] her with love and acceptance," would let her know "it was not her fault," and would ensure she received the appropriate health care.

Father testified Mother did not use any drugs when they were together. When he and Mother were together, Mother "fed [the girls], cleaned, and cooked . . . she did everything. All the basic things." He thought she was "okay" as a mother and thinks she became "unfit" when they broke up. From what he heard from TDFPS caseworkers, Mother's home was, at one point, like "Woodstock."

Jeff Napier, a licensed psychologist, conducted the court-ordered psychological evaluation of Mother on November 16, 2011. He testified a concern existed about whether Mother could properly supervise the children, and he was tasked with assessing Mother's emotional capacity for parenting. He testified Mother described relationship issues with her own mother and with men. Mother stated her mother physically abused her as a child. Mother attributed her involvement with TDFPS to her mother and complained that "she likes to call CPS on me." She described two significant romantic relationships, one with Father and one with B.D., and characterized them both as hostile and violent. At the time of the evaluation, Mother was receiving domestic violence counseling.

Napier testified Mother admitted marijuana use and told him she often smoked marijuana in the evening to help her sleep. She participated in a drug education class in 2002 at TDFPS's recommendation, but found the class only "marginally helpful."

Napier also testified that Mother did not report any significant amount of parenting stress but did state K.A.F. was a "little more active and energetic" and that it was difficult at times to get her to attend to directions.

Napier believed Mother was underreporting her problems and/or shortcomings, particularly with respect to her drug use and ability to parent. He found it "troublesome" that she

did not take responsibility "in a lot of the problems that she was describing" and that she attributed "almost all" the TDFPS allegations to her mom. He was unable to conclude that her "judgment and reliability relative to parenting is adequate" and recommended parenting classes and individual counseling. He thought the parenting classes could assist her in "developing and improving her child-management skills" and the counseling could assist her with her relationship issues. Napier believed it was "endangering" for the girls to be exposed to continued drug use and domestic violence because it created a "frightening environment" and could contribute to negligent supervision.

Karen Stewart, licensed counselor and substance abuse treatment provider, conducted Mother's substance abuse assessment in September 2012. Mother reported a history of drug and alcohol abuse on both sides of her family and admitted she was herself addicted to marijuana. Stewart testified Mother stated she had last used marijuana two weeks earlier and smoked "due to the stressors in her life." Mother talked with her about her issues and showed a lot of resentment and a co-dependency with abusive men. In Stewart's opinion, Mother's actions reflected low self-esteem. Stewart recommended "[d]rug education, anger management . . . relapse prevention" and counseling to address "co-dependency, accountability . . . coping skills and [the] low-self-esteem." Stewart testified she wanted to be Mother's counselor, but she never got the necessary paperwork from TDFPS.

Mother's mother testified that she "approve[d]" of the way Mother had taken care of the children. She did not want the children to be "in [TDFP's] custody" and, if the children were returned home, she and her husband were available to help. She testified she was a special education teacher and K.A.F. could come to school with her.

After hearing this and other evidence, the trial court found Mother's parental rights should be terminated on four of the eighteen statutory courses of conduct alleged. Specifically,

the trial court found Mother (1) knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical and emotional well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children; and (4) used a controlled substance, as defined by Chapter 481 of the Texas Health and Safety code, in a manner that endangered the health or safety of the children, and after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance. *See* TEX. FAM. CODE ANN. §161.001(D),(E),(O),(P). The trial court further concluded termination of Mother's parental rights was in the children's best interests. *See id.* § 161.001(2).

## SUFFICIENCY OF THE EVIDENCE

In issues two through five, Mother asserts the evidence is legally and factually insufficient to support the trial court's finding that termination was in the children's best interest and she (1) knowingly placed, or allowed the children to remain in conditions or surroundings which endangered their well-being; (2) engaged in conduct that was endangering to the children; and (3) failed to comply with a court order that established the actions necessary for her to get the children back. Mother does not challenge the trial court's finding that she used a controlled substance after completing a treatment program and in a manner endangering to the children. Generally, an unchallenged finding is binding on us and we do not need to address any complaints regarding the sufficiency of the evidence to support the unchallenged predicate grounds. *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.). However, as a matter of due process, a parent appealing a termination decree has a right to meaningful appellate review. *Id.* at 60 (op. on reh'g). Because an affirmative finding that Mother's rights should be

–15–

terminated based on her placing the children in dangerous conditions or engaging in endangering conduct could be used to support termination of her parental rights with respect to any future child she may have,[7] we continue our review. *Id.* at 60-61.

## Standard of Review

Because the natural right existing between parents and their children is of constitutional dimensions, termination proceedings are strictly scrutinized and require the application of the clear and convincing standard of proof. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The clear and convincing standard of proof is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

A trial court may terminate a parent-child relationship only upon clear and convincing proof that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001. Though evidence may be relevant to both elements, each element must be proven, and proof of one does not relieve the burden of proving the other. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). While both a statutory ground and best interest of the child must be proven, only one statutory ground is required to terminate parental rights. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true.

---

[7] *See* TEX. FAM. CODE ANN. § 161.001(M). That section provides that a trial court may terminate the rights of a parent who "has had his parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph D or E or substantially equivalent provisions of the law of another state." *Id.*

*E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).  We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved.  *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

In reviewing the factual sufficiency of the evidence in a termination proceeding, we consider and weigh all the evidence, but give due deference to the fact finder's resolution of factual questions.  *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We then determine whether the evidence is such that a fact finder could reasonably form a belief or conviction about the truth of the allegations against the parent.  *See H.R.M.*, 209 S.W.3d at 108.

Because only one statutory ground is required to terminate parental rights under section 161.001, when, as here, the termination order contains multiple statutory grounds, we may affirm the trial court's order on any one ground and a conclusion that termination is in the child's best interest.  *See In re K.W.*, 335 S.W.3d 767, 769-70 (Tex. App.-–Texarkana 2011, no pet.).

## Endangering Conduct

In her third issue, Mother contends the evidence is legally and factually insufficient to show she engaged in endangering conduct.  Endangering conduct is defined as conduct that exposes a child to loss or injury or jeopardizes a child's emotional or physical health. *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied)).   It is "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but it does not need to occur in the child's presence, be directed at the child, or cause actual injury.  *See E.N.C.*, 384 S.W.3d at 803; *Boyd*,

727 S.W.2d at 533; *Clark v. Clark*, 705 S.W.2d 218, 219 (Tex. App.—Dallas 1985, writ dism'd). Abusive or violent conduct by a parent or other resident of a child's home as well as conduct that subjects a child to a life of uncertainty and instability may endanger the physical and emotional well-being of the child. *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Drug use and its effects on a parent's life and ability to parent may also establish an endangering course of conduct. *See Walker v. Tex. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.-–Houston [1st Dist.] 2009, pet. denied). If the evidence shows a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child's physical or emotional well-being, then a finding under section 161.001(1)(E) is supportable. *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.); *In re J.C.*, 151 S.W.3d 284, 288 (Tex. App.-–Texarkana 2004, no pet.).

Here, the record shows that, during the ten-year period TDFPS was involved with the family, TDFPS investigated allegations of negligent supervision and sexual abuse of the children, domestic violence, and drug use. The domestic violence allegations were recurrent and continued even after Mother successfully completed domestic violence counseling in 2002 and 2009. The children witnessed the violence and reported the police being called to their home as a result. Napier, the psychologist who evaluated Mother, testified that it was "endangering" for the girls to be exposed to domestic violence because it could lead to negligent supervision and it created a "frightening environment." Mother, herself, also recognized the violence impacted the girls. Indeed, the February 2008 referral followed a severe assault of Mother by Father and K.A.F.'s expression of fear that Father would hurt her.

Further, allegations of Mother's drug use began in 2009. Although Mother abstained from smoking marijuana for an eight year period beginning in 2000, she began smoking again in

2008 to cope with the break-up with Father and to treat a medical condition. She completed a drug treatment program in 2009, but "relapsed" and began smoking even more often in 2010. She told Napier she often smoked in the evening to help her sleep and told Stewart, who conducted Mother's substance abuse assessment, that she smoked "due to the stressors in her life." Consistent with her statement to Stewart, Mother testified at trial that she "mainly smoked because of the situation [she is] going through." Although Mother testified she did not think her use of marijuana was "that serious," K.A.F. reported she had seen Mother using "weed" and Mother candidly admitted she smoked in violation of her terms of probation. The smoking was also in violation of the requirement in her service plan that she "maintain a safe and appropriate home environment for her children." Stewart, who met with Mother just two months before trial, recommended Mother receive drug education. According to Napier, the drug use, like the exposure to domestic violence, was "endangering" for the girls because it, too, could lead to negligent supervision. In fact, the children were removed from the home in 2009 because of concerns that her drug use impaired her ability to properly supervise the children.

Mother's drug use and choice in men affected not just the girls' physical well-being but also their emotional well-being. K.A.F. suffered from post-traumatic stress disorder, was hospitalized twice during the year leading up to trial, and was then placed in "intensive" care, where she remained as of the date of trial. D.A.F. required counseling, and though A.L.F. required no treatment, she told TDFPS investigator Williams that her mom was Father's wife, suggesting she had no bond with Mother.

The girls' well-being was also affected by Mother's "whippings." Although no witness testified Mother physically abused the children, both K.A.F. and D.A.F. expressed fear of being returned home to Mother because of the "whippings," and Mother admitted she had "whipped" the girls on occasions, leaving bruises.

Viewing these facts under the appropriate standard of review, we conclude a reasonable fact finder could form a firm belief or conviction that Mother's violent relationships with Father and B.D., continued marijuana use, and "whippings" resulting in bruises endangered the children. Although Mother might not have been violent toward Father and might have been acting in self-defense when she assaulted B.D., as she contends on appeal, Father and B.D. were both violent toward Mother, and the children witnessed some of the violence. Evidence of domestic violence may establish evidence of endangerment. *J.I.T.P.*, 99 S.W.3d at 845. Moreover, although Mother recognized her relationships with Father and B.D. "were not good for the children and she want[ed] to change," she was in a BIP program and had learned she could not leave bruises when disciplining, and had not been in a relationship in over a year, she testified at trial that she could benefit from further counseling but failed to complete the domestic violence counseling that was ordered following the last referral. *See J.O.A.*, 283 S.W.3d at 346 ("evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.").

With respect to the drug use, although Mother contends she smoked marijuana to treat a medical condition, the record also reflects she smoked to cope with "life stressors." Further, although Mother contends she did not smoke around the children, K.A.F. reported she had seen Mother smoking. We conclude, contrary to Mother's contention that her smoking did not harm the children, that by continuing to smoke, even after completing a drug treatment program in 2009, Mother put herself at risk of being impaired and jailed for violating a term of probation and subjected her children to a life of uncertainty and instability. *See Walker*, 312 S.W.3d at 617-18 ("Because [drug use] exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).").

–20–

We also conclude that Mother's combined actions–(a) relationships with Father and B.D., even after completing domestic violence counseling in 2002 and 2009; (b) continued drug use, knowing her parental rights were in jeopardy; and (c) "whippings" that left bruises on the girls–together established a voluntary, deliberate, and conscious course of conduct that harmed the children physically and emotionally. *See In re A.C.*, 394 S.W.3d 633, 641 (Tex. App.-–Houston [1st Dist.] 2012, no pet.) (endangerment finding supported by evidence of Mother's continued drug use and admission that such use put child at risk); *M.R.*, 243 S.W.3d at 819 (same - evidence that child exposed to domestic violence); *In re C.L.C.*, 119 S.W.3d 382, 398 (Tex. App.-–Tyler 2003, no pet.) (same - evidence of abusive or violent conduct by parent); *Robinson*, 89 S.W.3d at 686-87 (same – evidence that mother's illegal drug activity violated terms of community supervision and service plan). We resolve Mother's third issue against her. Because we conclude the evidence is legally and factually sufficient to support the trial court's finding that Mother's rights should be terminated under section 161.001(1)(E), we need not address Mother's arguments concerning the remaining statutory findings and turn to the best interest finding. *See K.W.*, 335 S.W.3d at 770.

**Best Interest**

In her fifth issue, Mother challenges the trial court's determination that it was in the children's best interest to terminate her parental rights. A strong presumption exists that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). At the same time, however, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a) (West 2008). In determining whether termination of parental rights is in the child's best interest, we may consider the evidence establishing one of the predicate grounds under section 161.001(1), along with the following factors:

–21–

1. the child's desires;

2. the child's present and future emotional and physical needs;

3. the present and future emotional and physical danger to the child;

4. the parenting abilities of the persons seeking custody;

5. the programs available to the persons seeking custody to help promote the best interest of the child;

6. the plans for the child by those persons seeking custody;

7. the stability of the home or proposed placement;

8. the parent's acts or omissions that may indicate the existing parent-child relationship is not a proper one;

9. any excuse for the acts or omissions of the parent; and,

10. the parent's willingness and ability to provide a safe environment as evidenced by the child's age and vulnerabilities; developmental evaluations of the child's parents, other family members, and others who have access to the child's home; any history of substance abuse by the child's family or others who have access to the child's name; the willingness and ability of the child's family to effect positive changes within a reasonable period of time; and adequacy of parenting skills.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *A.C.*, 394 S.W.3d at 641-42 (citing TEX. FAM. CODE ANN. § 263.307(b)). No requirement exists that TDFPS prove all these factors, and the lack of evidence of some factors does not preclude a finding of best interest. *A.C.*, 394 S.W.3d at 642.

In arguing the evidence is insufficient to support the finding that termination is in the children's best interest, Mother asserts there is little or no evidence that she was a danger to the children, of what the children wanted, or of specific plans for the children, but sufficient evidence exists that K.A.F.'s behavior worsened while in TDFPS's custody, that Mother had "cleaned up her act," and that Mother was regretful of and accepted responsibility for her actions that led to losing her children.

Although Mother disputes evidence exists she was a danger to the children, we have concluded that her relationships with Father and B.D., continued drug use, and treatment of the children endangered the children. Additionally, although Mother testified she was regretful of and accepted responsibility for her actions, she also told the psychologist who evaluated her that her mother was to blame for her long history with TDFPS. This evidence, along with the evidence of Mother's endangering conduct, established Mother was not willing and able to provide the girls with a safe environment, had not entirely "cleaned up" her act, and lacked appropriate parenting skills.

The record also reflects Mother was unable and unwilling to effect positive changes. For example, although some evidence was presented that she had difficulty obtaining from TDFPS the services she needed to be reunified with her children, testimony was presented that she could have set up some services herself because she had been given the necessary information. However, she failed to do so and failed to complete the services that were offered. Further, evidence was presented that Mother had "cleaned up her act" after the 2002 and 2009 referrals, but had "fallen off the wagon" each time. This evidence combined established the children would be faced with uncertainty and instability if returned to Mother.

By contrast, testimony established that termination of Mother's rights provided an opportunity for the children to have stability and permanency. During their one year stay in foster care, D.A.F. and A.L.F. thrived. D.A.F. completed counseling and was showing no signs of regression. The plan for these girls was adoption, and two families expressed an interested in adopting them. Although K.A.F. suffered from post-traumatic stress disorder, had been hospitalized twice, and remained in an intensive treatment center at the time of trial, she had made steady improvement in the one year she had been in foster care. The plan for her was adoption once she was discharged from the treatment center.

Applying the appropriate legal standard, we conclude that, from this evidence, the trial court could have formed a firm belief and conviction that termination of Mother's rights was in the children's best interest. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (best interest finding supported by parents' "poor judgment" and constant drug use); *In re C.R.*, 263 S.W.3d 368, 376-77 (Tex. App.—Dallas 2008, no pet.) (same - parent's failure to complete parenting classes and unwillingness to stop using drugs where evidence showed child needed stability and consistency, was doing well in foster care, and would be adopted); *In re S.B.*, 207 S.W.3d 877, 887-88 (Tex. App.—Fort Worth 2006, no pet.) (same - drug use, inability to provide stable home, and failure to comply with service plan). Although Mother correctly notes that "little or no" evidence was presented regarding the children's desire, one of the factors to consider in determining best interest, no requirement exists that TDFPS prove all the factors. *See A.C.*, 394 S.W.3d at 642. We resolve Mother's fifth issue against her.

## DUE PROCESS VIOLATION

In her first issue, Mother contends she was deprived of fair treatment and due process by (1) TDFPS's "global pleading" in which TDFPS alleged "every possible ground for termination, even though it had <u>no intention</u> of proving most of such grounds;" and (2) TDFPS's offer of services when it "never intended to return the children due to the sexual assault on [K.A.F.] by [F]ather." Mother asserts the "global pleading" failed to provide her fair notice of TDFPS's case and, had she known earlier that TDFPS intended to terminate her rights, "a total different strategy would [have been] taken." Mother, however, makes these arguments for the first time on appeal. To preserve these arguments for review, Mother needed to bring the issue to the trial court's attention by timely request, objection, or motion. *See* TEX. R. APP. P. 33.1; *see also In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003). Because she failed to do so, her complaint is waived. *See J.F.C.*, 96 S.W.3d at 304 ("Texas's preservation of error rules promote the child's interest in

–24–

a final decision and thus placement in a safe and stable home, because they preclude appellate courts from unduly prolonging a decision by appellate review of issues not properly raised in the trial court."). We resolve Mother's first issue against her.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In her sixth issue, Mother asserts her trial counsel was ineffective. Specifically, she asserts counsel was ineffective in failing to (1) file a motion to sever the trial of Father from her trial and (2) properly object to the admission of "the entire CPS report."

An indigent parent in a termination proceeding in Texas has a statutory right to effective assistance of counsel. *See* TEX. FAM. CODE ANN. § 107.013(a)(1) (West Supp.2012); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). Claims of ineffective assistance of counsel are evaluated under the same standards as those set forth for criminal defense counsel in *Strickland v. Washington*, 466 U.S. 668, 681 (1984). *M.S.*, 115 S.W.3d at 544-45. To succeed on an ineffective assistance claim, a parent must first establish her counsel's performance was deficient. *Id.* at 545. Once deficiency has been established, the parent must show counsel's deficient performance prejudiced the case. *Id.*

In reviewing counsel's performance on appeal, we indulge in a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, including the possibility that counsel's actions were strategic. *Id.* To overcome the presumption that counsel provided reasonable assistance, the record must be sufficiently developed and fully support the allegation; a silent record will not overcome the presumption. *See In re J.W.*, 113 S.W.3d 605, 616 (Tex. App.-–Dallas 2003, pet. denied) (citing *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999)). In analyzing whether counsel's deficient performance prejudiced the case, we determine whether a reasonable probability exists that, but for counsel's deficient

performance, the result of the proceeding would have been different. *M.S.*, 115 S.W.3d at 549-50.

The record, here, is silent as to counsel's strategy. Mother did not file a motion for new trial and call her trial counsel as a witness to explain his reasons for failing to file a motion to sever and "properly object" to the admission of "the entire CPS report." Mother, therefore, has failed to rebut the presumption that counsel's conduct fell within the range of reasonable professional assistance. *See J.W.*, 113 S.W.3d at 616. This failure defeats her ineffectiveness claim. *See id.* We resolve Mother's sixth issue against her.

## CONCLUSION

We affirm the trial court's judgment.

121582F.P05

/Carolyn Wright/
CAROLYN WRIGHT
CHIEF JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF K.A.F., D.A.F.
AND A.L.F., CHILDREN

No. 05-12-01582-CV

On Appeal from the 256th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 08-18472-Z.
Opinion delivered by Chief Justice Wright,
Justices Lang-Miers and Lewis participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's judgment.

.

Judgment entered June 14, 2013

/Carolyn Wright/
CAROLYN WRIGHT
CHIEF JUSTICE